IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NESHAMINY CONSTRUCTORS, INC.  :    CIVIL ACTION

       v.     :

CONCRETE BUILDING SYSTEMS, INC. :    NO.  06-1489

## MEMORANDUM OF DECISION

THOMAS J. RUETER          September 18, 2007
United States Magistrate Judge

     Before the court for decision is an action filed by plaintiff, Neshaminy

Constructors, Inc., alleging that defendant, Concrete Building Systems, Inc., breached the terms

of their alleged contract.  In the alternative, plaintiff seeks to recover under the doctrine of

promissory estoppel.

     The parties consented to trial before the undersigned and the Honorable J. Curtis

Joyner referred the trial to this court by Order dated September 20, 2006.  (Doc. Nos. 17 and 18.)

Trial commenced on January 8, 2007 and testimony was heard through January 10, 2007.[1]

Closing arguments were presented on March 7, 2007 and each party submitted proposed Findings

of Fact and Conclusions of Law.  (Doc. Nos. 48, 49, 50.)  At the invitation of the court, each

party submitted a letter brief dated April 18, 2007, which addressed the recent decision of the

Third Circuit Court of Appeals in Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482

F.3d 247 (3d Cir. 2007).

---

   [1]   Transcripts of the trial testimony were prepared and filed with the court. (Doc.
Nos. 45, 46, 47.)  The transcript from the first day of trial, January 8, 2007, will be referred to
herein as "Tr. I."  The transcript from the second day of trial, January 9, 2007, will be referred to
as "Tr. II."  The transcript from the third day of trial, January 10, 2007, will be referred to as "Tr.
III."

In accordance with Fed. R. Civ. P. 52(a), the court makes the following:

## I.  FINDINGS OF FACT

### A.  The Parties and the Project

1.  Plaintiff, Neshaminy Constructors, Inc. (hereinafter "plaintiff"), a general contractor, is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Feasterville, Pennsylvania.

2.  Defendant, Concrete Building Systems, Inc. (hereinafter "defendant"), a precast concrete contractor, is a corporation organized under the laws of the State of Delaware with its principal place of business in Delmar, Delaware.

3.  The project at issue involved the construction of a multi-story parking garage in Norristown, Pennsylvania, formally known as the Norristown Transportation Intermodal Parking Facility (the "Project").

4.  The owner of the Project is the Southeastern Pennsylvania Transportation Authority ("SEPTA").

5.  The Project was offered as a public competitive bid project in accordance with SEPTA's procedures and regulations.

6.  Prior to the events leading to the present litigation, plaintiff and defendant had never worked with each other nor had either party submitted or received a bid from the other party.  (Tr. II at 28, 206.)

7.      SEPTA issued an "Invitation to Bid" to solicit bids from general contractors for the construction of the Project.  SEPTA estimated that the value of the Project was between $11,000,000 and $12,000,000.  (Ex. D-2.)

8.      SEPTA, in its Invitation to Bid, required that bidders attain, or explain their efforts to attain, Disadvantaged Business Enterprise ("DBE") participation at the level of twenty-two percent.  (Ex. P-43.)

9.      The bid deadline was postponed on several occasions.  The final postponement extended the bid deadline to 3:00 p.m. on March 2, 2006 (the "Bid Day").  (Tr. I at 70; Ex. D-5.)

**B.      Defendant's Proposal and Plaintiff's Bid on the Project**

10.     Plaintiff determined that it would submit a bid to SEPTA for the Project (the "Bid").  (Tr. I at 217-19; Tr. II at 128-29.)

11.     One of the reasons plaintiff decided to submit a bid for the Project was because the Project, if awarded to plaintiff, would fill a gap in plaintiff's work load during the summer of 2006.  (Tr. II at 128-30, 139.)

12.     During the time leading up to the Bid Day, defendant represented to plaintiff that it would submit a quote to plaintiff to furnish and erect the precast concrete elements required for the Project (the "Precast Elements").  (Tr. I at 54-55.)

13.     One of the reasons defendant decided to submit a bid to plaintiff for the Project was because it also had an open production slot beginning in June 2006.  (Tr. I at 159-60.)

14.     At approximately 10:00 a.m. on the Bid Day, March 2, 2006, defendant submitted a written proposal to furnish and erect the Precast Elements to plaintiff with the price term left

blank (the "Proposal").  (Ex. D-8.)  The Proposal was five pages in length, including a two page

list of inclusions and exclusions.  Id.

15.     At the top of the Proposal, defendant identified that it was a "**SEPTA**

**CERTIFIED DBE**."  (Ex. D-8 (emphasis in original).)

16.     In the Proposal, defendant stated that the erection of the Precast Elements would

be performed by a "PCI Qualified erector."  (Ex. D-8.)

17.     Defendant stated as follows in the Proposal: "The proposal is based on contract

award by April 15, 2006, start of fabrication work in June 2006 and erection start in

November/December 2006."  (Ex. D-8.)  Defendant conditioned its proposal on these specific

time frames because it had an available slot in its production facilities in June through August

2006 that it needed to fill.  (Tr. I at 107, 159-60.)

18.     The Proposal further stated that it "will be void if not accepted with [sic] in 30

days."  (Ex. D-8 (emphasis in original).)

19.     The Proposal stated that it was subject to, among other things, "availability of

facilities."  (Ex. D-8.)

20.     The Proposal stated that it was subject to, among other things, "execution of

mutually acceptable contract and delivery schedule."  (Ex. D-8.)

21.     The Proposal included a calculation for the cost of the erection work that was

derived from a bid defendant received from Jonasz Precast, Inc. ("Jonasz").  (Tr. I at 83-84.)

22.     Both plaintiff and defendant contemplated entering into a written subcontract

agreement for the services to be provided by defendant for the Project.  (Tr. I at 171, 197-98; Tr.

II at 74; Ex. D-19.)

23.     By way of contrast, when plaintiff intends to purchase goods or materials only, it typically uses a purchase order or a material contract form, not a subcontract agreement.  (Tr. II at 74.)

24.     On the morning of the Bid Day, after defendant's Proposal was sent to plaintiff with the price term omitted, Walter O'Day, defendant's project manager of sales, contacted plaintiff and informed plaintiff that defendant's price to perform the work set forth in the Proposal was $5,400,000.  (Tr. I at 58-59, 81.)

25.     Despite representing approximately one-third of the total Project cost and constituting the largest subcontracted portion of the Project, plaintiff only "quickly" reviewed defendant's Proposal.  (Tr. I at 58; Tr. II at 32.)

26.     Between approximately 10:30 and 11:30 a.m. on the Bid Day, Douglas McInnes, a project engineer for plaintiff, called Mr. O'Day for the purpose of confirming defendant's price because defendant's price was lower than the next proposal by $1,000,000.  (Tr. I at 63-64, 66-67, 81-82, 225-26.)

27.     After discussing the issue with Viren Sharma, defendant's president and sole shareholder, Mr. O'Day called Mr. McInnes and confirmed defendant's price of $5,400,000 for the work outlined in the Proposal.  (Tr. I at 81-82, 155.)

28.     After confirming the price to plaintiff, but before plaintiff submitted a bid to SEPTA, Mr. O'Day received a telephone call from Daniel J. Keating Construction Co. ("Keating"), a general contractor to whom plaintiff also submitted a proposal for the Project. Keating inquired whether defendant's proposal to Keating took into account the 150% crane

5

safety lifting requirement ("150% Crane Requirement") set forth in the SEPTA specifications.
(Tr. I at 92-93, 114; Ex. D-1.)

29.     Defendant subsequently discovered that its Proposal to plaintiff, as well as its
proposal to Keating, did not account for the 150% Crane Requirement.  (Tr. I at 114.)

30.     Defendant first became aware of the 150% Crane Requirement on March 2, 2006
as a result of the telephone call from Keating.  Although defendant had had in its possession a
copy of the SEPTA specifications section that detailed the 150% Crane Requirement for some
time, defendant had not read that section of the SEPTA specifications.  (Tr. I at 92-93, 150-51;
Ex. D-1.)

31.     Defendant sent by facsimile the relevant portions of the SEPTA specification to
Jonasz, its precast concrete erector in the Proposal, to determine whether Jonasz had included in
its bid to defendant the 150% Crane Requirement and, if not, required Jonasz to list the
additional cost of complying with the requirement.  (Tr. I at 114-15; Ex. D-9.)

32.     Mr. O'Day subsequently called Mike Barrett of Jonasz.  Mr. Barrett explained that
the Jonasz bid to defendant did not include the 150% Crane Requirement.  Mr. Barrett further
stated that Jonasz was adding a maximum of $200,000 to its price in order to comply with the
requirement.  (Tr. I at 94, 114-15; Ex. D-9.)

33.     Mr. O'Day discussed the issue with Mr. Sharma who decided to add $200,000 to
defendant's Proposal to cover the cost of complying with the 150% Crane Requirement.  Mr.
Sharma instructed Mr. O'Day to notify both Keating and plaintiff that defendant was increasing
its price in the proposals for the Project by $200,000, to $5,600,000.  (Tr. I at 164-65; Exs. D-7,
D-10.)

6

34.     At approximately 2:00 p.m. on Bid Day, Mr. O'Day called plaintiff and informed plaintiff that defendant was increasing the price quoted in its Proposal by $200,000 in order to comply with the 150% Crane Requirement.  (Tr. I at 75-76, 115-16, 228, 231-32; Tr. II at 34, 38.)

35.     Glenn Schwartz, the Chief Operating Officer and a lead estimator for plaintiff, recorded the price increase in his handwritten notations placed on defendant's Proposal.  Mr. Schwartz set forth his understanding of his conversation with Mr. O'Day by writing the following notes on the Proposal: (1) "150%;" (2) "used 300 ton/450 ton;" and (3) "+200K."  (Tr. I at 228; Tr. II at 33-34; Ex. D-10.)

36.     Mr. Schwartz knew that defendant received the $200,000 price increase from its erector, Jonasz, and that defendant was passing along the Jonasz price increase when defendant increased the price in its Proposal.  (Tr. I at 116-17, 228.)  Mr. Schwartz acknowledged this by writing "Jonus [sic] Erectors" on defendant's Proposal.  (Ex. D-10; Tr. I at 231-32; Tr. II at 33-34.)

37.     Mr. Schwartz disagreed with defendant's price increase and stated that he did not think the larger crane should cost so much and "didn't think that a crane - - that a larger crane was gonna be required."  (Tr. I at 96-97, 116, 228-29, 231; Tr. II at 34-36; Ex. P-20.)

38.     Mr. Schwartz agreed during his testimony that whether he thought it was a good idea or a bad idea for defendant to increase its price, defendant did increase its price by $200,000.  (Tr. II at 38.)

39.     Mr. O'Day did not agree to lower defendant's price from $5,600,000.  (Tr. I at 116-17, 231; Tr. II at 35-36.)

40.     Even though defendant increased its price by $200,000 to $5,600,000, plaintiff

unilaterally decided to include in the Bid a price for the precast concrete work of $5,500,000.

Plaintiff did not include in the Bid the actual price quoted by defendant of $5,600,000.  (Tr. I at

46-47; Tr. II at 42-45.)

41.     Later, on March 8, 2006, Jonasz advised defendant that the actual added cost to

comply with the 150% Crane Requirement was $49,750.  (Tr. I at 87; Ex. P-9.)

42.     Regardless of the actual price to Jonasz to comply with the 150% Crane

Requirement, defendant increased its price by $200,000 to $5,600,000 on Bid Day.  (Tr. I at 118,

165; Tr. II at 38, 47.)

43.     Despite including $5,500,000 in the Bid for the precast concrete work, plaintiff

intended to further negotiate with defendant in an attempt to convince defendant to perform the

work for $5,400,000.  (Tr. II at 44.)

44.     The total amount of plaintiff's Bid for the Project was $15,428,700.  (Tr. I at 71;

Ex. D-11.)  Plaintiff's Bid exceeded the SEPTA engineers' budget by several million dollars.

(Tr. I at 71.)

45.     Plaintiff was the only general contractor who submitted a bid for the Project.  (Tr.

I at 71.)

46.     SEPTA required bids to remain open for ninety days.  (Tr. I at 220-21, 227-28;

Ex. P-43.)

C.      **Post-Bid Day Activities**

47.      Shortly after bid opening, at approximately 4:00 p.m. on Bid Day, Mr. O'Day of defendant called Mr. McInnes of plaintiff to determine how the bidding process transpired.  Mr. O'Day received Mr. McInnes' voicemail and left a message.  (Tr. I at 98-9; Ex. D-21.)

48.      Defendant also called SEPTA and learned that plaintiff was the sole bidder.  (Tr. I at 211-12.)

49.      At approximately 10:40 a.m. on March 3, 2006, the day after Bid Day, Mr. O'Day again called Mr. McInnes to ascertain the status of the Bid.  Unable to reach Mr. McInnes, Mr. O'Day again left a voicemail message.  (Tr. I at 98-99; Ex. D-21.)

50.      As the only bidder, plaintiff was the low bidder.  (Tr. I at 67, 237; Ex. D-12.)

51.      Because plaintiff's Bid was higher than the estimated cost that SEPTA had placed on the Project, it was not clear to plaintiff whether SEPTA intended to award the Project to plaintiff.  (Tr. II at 58-63, 146-47, 161-62.)

52.      On March 6, 2006, plaintiff attended a meeting with individuals from SEPTA and the Project engineer.  At the meeting, Joseph Canuso, Esquire, CEO of plaintiff since 2003, informed SEPTA that plaintiff could meet the 455 day schedule and the "key is the p/c'er (precast subcontractor)."  (Tr. II at 123, 136; Ex. D-13.)

53.      At the March 6, 2006 meeting, Mr. Canuso further confirmed to SEPTA that precast fabrication must occur in June, July and August to meet defendant's Proposal and the overall Project schedule.  Mr. Canuso advised SEPTA that it would take twelve to fourteen weeks to complete shop drawings, twelve to sixteen weeks to complete fabrication, and twelve to sixteen weeks to complete erection.  (Tr. II at 137-38; Ex. D-13.)

54.     In a letter dated March 8, 2006 written by Mr. Schwartz, plaintiff advised SEPTA that its precast concrete subcontractor "has space available in June, July and August, 2006," and that "if the SEPTA award is delayed, then this available shop time [by defendant] will elapse, and the price of the project will, no doubt, substantially increase." (Ex. D-14.)

55.     Plaintiff knew that defendant's facilities were "subject to availability," and that defendant's Proposal was conditioned upon fabrication of the precast concrete commencing in June. Plaintiff knew that delay in award of the Project by SEPTA would require plaintiff to obtain another precast subcontractor. (Tr. II at 62-3, 136-38; Ex. D-14; Findings of Fact Nos. 52-54.)

56.     By letter dated March 17, 2006, SEPTA began preliminary paperwork necessary to award the Project to a contractor. In this letter, SEPTA requested plaintiff to submit DBE participation information. (Tr. I at 237-39; Ex. P-25.)

57.     The first time after Bid Day that plaintiff contacted defendant was on March 20, 2006. Plaintiff did not return the voicemail messages from Mr. O'Day to Mr. McInnes inquiring about the status of the Bid on March 2 and 3, 2006. (Tr. I at 120, 238; Tr. II at 8-9, 10.)

58.     On March 20, 2006, plaintiff called defendant to request the break-out price for the shop drawings for the Project and told defendant that "it looked like the job was moving forward." (Tr. I at 104-05, 237-39; Exs. P-2, P-20.)

59.     Defendant replied that it would "get back" to plaintiff. (Tr. I at 104-05, 239, 242; Tr. II at 9; Ex. P-20.) Defendant was not interested in performing the shop drawings alone because that work would not fill defendant's shop capacity in the summer of 2006. Defendant did not perform the shop drawings. (Tr. I at 121, 170.)

60.     In response to plaintiff's inquiry, SEPTA told plaintiff on March 21, 2006 that no decision had been made on the Project.  (Tr. II at 70-71; Exs. D-16, D-17.)

61.     On Thursday, March 23, 2006, plaintiff repeated its request that defendant provide a break-out price for the shop drawings.  On Friday, March 24, 2006, plaintiff told defendant that it appeared fairly certain that SEPTA was going to award the contract to plaintiff and again requested the break-out price for shop drawings.  Defendant replied that it would respond by Monday, March 27, 2006.  (Tr. I at 103-04, 237-39, 242; Tr. II at 9, 69-73; Exs. P-2, P-20.)

62.     Defendant committed its facilities to another general contractor, EDIS, on Friday, March 24, 2006, with whom defendant had a firm and definite commitment to work.  (Tr. I at 127.)

63.     On Monday, March 27, 2006, defendant informed plaintiff that defendant had committed its facilities to another project and gave plaintiff a new schedule for the Project.  (Tr. I at 243.)

64.     At the time defendant committed its facilities to EDIS, plaintiff admits that defendant was aware that SEPTA had told plaintiff only that "it looked like the Project was going ahead."  (Pl.'s Proposed Finding of Fact No. 91 (citing Tr. I at 102-05).)

65.     In an e-mail dated March 27, 2006, plaintiff again inquired of SEPTA about the Project.  At that time, plaintiff advised SEPTA that defendant obtained additional work and that plaintiff was in jeopardy of losing defendant's fabrication window.  (Tr. II at 219-20; Ex. D-18.)

66.     In an e-mail dated March 27, 2006, plaintiff admits that SEPTA had not yet decided to award the Project to plaintiff.  (Ex. D-18.)

67.     As of April 4, 2006, after the Proposal had expired by its own terms after the passage of thirty days, SEPTA had not awarded the Project to plaintiff.  On April 4, 2006, a SEPTA official informed plaintiff as follows:  "SEPTA must emphasize that until this item is voted on at the April Board [meeting], no individual in this Authority has the ability to direct [plaintiff] to begin work, even if a recommendation to award is being made."  (Ex. D-23.)

68.     Mr. Canuso, CEO of plaintiff, testified that he viewed SEPTA's April 4, 2006 e-mail as "slapping my hand by having direct communications with him and attempting to induce him to award it."  (Tr. II at 221.)

69.     Mr. Canuso continued to press SEPTA to award the Project to plaintiff even after plaintiff knew: (1) defendant had accepted other work; (2) defendant was unable to perform in accordance with its original Proposal; and (3) the cost of the Project would increase because plaintiff had to replace defendant.  (Tr. II at 221; Ex. D-18; Findings of Fact Nos. 52-55.)

**D.      The EDIS Commitment**

70.     On March 3, 2006, defendant sent a quote to perform a job to a contractor named EDIS (the "EDIS Project").  (Tr. I at 101; Ex. P-13.)

71.     The EDIS Project would occupy defendant's facilities from June through August, 2006.  Defendant could not perform the work outlined in the Proposal for plaintiff and the work for the EDIS Project at the same time.  (Tr. I at 102, 155-56.)

**E.      Events After Defendant Committed to EDIS**

72.     On Monday, March 27, 2006, Mr. O'Day informed Mr. Schwartz that defendant committed its June 2006 production time to EDIS and submitted a revised schedule of dates for

production and erection.  (Tr. I at 127.)  In the revised schedule, defendant proposed fabrication of the Precast Elements in January 2007.  (Tr. I at 102-05, 127, 137.)

       73.    On March 28, 2006, plaintiff sent a letter to defendant stating that it had relied upon the Proposal in making the Bid.  (Tr. II at 152-55, 163-67; Ex. P-30.)

       74.    Plaintiff also prepared and sent to defendant on or about March 30, 2006, a document titled "Letter of Intent."  (Ex. D-19.)  The Letter of Intent differed from the Proposal in the following material ways:

> (1)    reflected a final price of $5,400,000, not the price plaintiff included in the Bid of $5,500,000 and not final price quoted by defendant of $5,600,000 (Tr. I at 171; Tr. III at 55; Ex. D-19);
>
> (2)    required defendant to break-out the cost of the shop drawings and begin them immediately upon agreement to the price, whereas the Proposal was for the entire Project, including shop drawings (Tr. I at 172-73; Ex. D-19). If defendant prepared the shop drawings but SEPTA did not award the Project to plaintiff, plaintiff would pay only for the shop drawings and defendant's production capacity would go unused during the summer 2006 (Tr. II at 73);
>
> (3)    allowed plaintiff the unilateral right to modify the production schedule whereas the Proposal was based upon and required production starting in June 2006 (Tr. I at 173; Tr. III at 55; Ex. D-19);

(4)     requested defendant to submit a price for performance and payment bonds despite exclusion of bonds in defendant's Proposal (Tr. I at 174-75; Tr. III at 58, 59-60; Ex. D-19);

(5)      required defendant to perform all field surveying whereas the Proposal excluded field measurement (Tr. I at 176-77; Tr. III at 55; Ex. D-19); and

(6)     required defendant to work double shifts on weekends as necessary to complete the work, a term not included in the Proposal (Tr. III at 56-7; Ex. D-19).

75.     The Letter of Intent was intended to be an attachment to plaintiff's March 28, 2006 letter and transmitted with that letter to defendant.  However, because of secretarial error, the Letter of Intent was not sent to defendant by facsimile until March 30, 2006.  (Tr. II at 212-13.)

76.     Plaintiff describes the Letter of Intent as "standard," and asserts that it "[confirms] both the commitments [defendant] made to [plaintiff] and [plaintiff's] acceptance and reliance on those commitments."  (Pl.'s Proposed Finding of Fact No. 107.)  However, as detailed in Finding of Fact No. 74 above, the Letter of Intent altered the terms of the Proposal.

77.     Plaintiff attached an altered version of the Proposal to the Letter of Intent.  (Ex. D-14.)  Plaintiff used the product "White-Out" to cover Mr. Schwartz's notes referencing Jonasz Erectors and "+ $200K."  (Tr. II at 53-54, 154-55, 210-211.)

78.     Plaintiff was unwilling to commit to any part of the Project with defendant, other than the shop drawings, until plaintiff received the actual award of the contract from SEPTA. (Tr. II at 85, 216-18.)

14

79.     Defendant did not sign the Letter of Intent.  (Ex. P-4.)

80.     By letter dated April 4, 2006, after expiration of the thirty day period set forth in the Proposal, defendant reiterated to plaintiff that it would be unable to perform the work contemplated in the Proposal.  (Ex. P-4.)  Defendant also raised objections to the terms of the Letter of Intent.  (Ex. P-4.)

81.     Plaintiff continued to pursue SEPTA for an award of the Project even after March 27, 2006 when defendant provided its revised production schedule to plaintiff.  (Tr. II at 74-75.)

82.     By letter dated April 6, 2006, plaintiff confirmed to SEPTA that plaintiff would complete the Project for the original bid price notwithstanding defendant's inability to serve as the precast concrete subcontractor.  (Ex. D-24.)

83.     On April 7, 2006, Mr. Canuso questioned going forward with the Project in light of additional costs associated with replacing defendant.  (Ex. D-25.)

84.     As of April 8, 2006, twelve days after defendant provided its new production schedule to plaintiff, plaintiff believed that it "had additional outs, if required," i.e., that it could avoid any future obligations to SEPTA for the Project.  (Tr. II at 76; Ex. D-25.)

85.     Defendant began the engineering for the EDIS Project in April 2006.  (Tr. I at 140.)

86.     Defendant began fabricating the precast concrete elements for the EDIS Project in June 2006.  (Tr. I at 99-100.)

87.     Defendant required at least eight weeks to prepare the shop drawings prior to fabrication of the Precast Elements.  In order to begin production in June, the shop drawings had to be started in early April.  (Tr. I at 92.)

88.     SEPTA awarded the contract for the Project to plaintiff at the Board meeting on

May 25, 2006.  (Ex. D-33.)  The Notice to Proceed date was set as July 13, 2006.  (Tr. II at 64;

Ex. D-34.)

89.     SEPTA does not review shop drawings for approval until after the award and

Notice to Proceed.  (Tr. II at 64.)

90.     Fabrication of the Precast Elements could not begin until after SEPTA approved

the shop drawings.  (Tr. II at 64.)

91.     The review and approval period for shop drawings by SEPTA is approximately

thirty days.  (Tr. II at 65.)

92.     In light of these time requirements and the fact that the Notice to Proceed was

issued July 13, 2006, fabrication of the Precast Elements for the Project could not have

commenced until August, 2006 at the earliest.  (Tr. II at 64-5.)

93.     Shop drawings for the Precast Elements for the Project were submitted to SEPTA

on August 30, 2006.  (Tr. II at 66-7; Ex. D-43.)  Plaintiff received approval of the shop drawings

by SEPTA on October 4, 2006.  (Tr. II at 67-8; Ex. D-44.)  Actual production of the Precast

Elements for the Project began on October 10, 2006.  (Tr. II at 69; Ex. D-45.)

94.     It would have been impossible for defendant to perform the work pursuant to the

schedule upon which its Proposal was based, i.e., "start of fabrication in June 2006 and erection

start in November/December 2006."  (Ex. D-8.)

F.      **Plaintiff's Efforts to Replace Defendant**

95.     After defendant notified plaintiff it no longer could perform under the Proposal, plaintiff began efforts to obtain a replacement precast concrete fabricator and erector.  (Tr. II at 183-86; Exs. P-20, P-34, P-39.)

96.     Plaintiff also began efforts to find a replacement subcontractor to meet SEPTA's DBE participation goal.  (Tr. II at 173-79, 186-87; Exs. P-31, P-32, P-45, P-48.)

97.     Newcrete Products agreed to furnish, but not erect, the Precast Elements for the Project for $5,152,800.  (Tr. II at 183-98; Exs. P-39, P-40A, P-54.)

98.     Structural Services, a DBE, agreed to erect the Precast Elements and to furnish certain other Precast Elements.

99.     Structural Services agreed to erect the Precast Elements for $783,585.  (Tr. II at 183-98; Ex. P-34.)

100.    Plaintiff paid a premium of approximately $36,000 to Structural Services above what it otherwise would have paid for these Precast Elements.  (Tr. II at 26, 179, 186-87.)

101.    By replacing defendant, plaintiff contends it suffered damages in the amount of $572,385, calculated by subtracting from the $5,936,385 cost to cover ($5,152,800 + $783,585), the $5,400,000 that defendant had quoted and adding the $36,000 premium that plaintiff had to pay to meet SEPTA's DBE requirement.  (Tr. II at 183-98; Exs. P-34, P-39, P-40A, P-54.)[2]

---

[2]      Plaintiff acknowledges that should the court conclude that the price quoted by defendant was $5,400,000 plus the $49,750 cost for the larger crane, its damages would  decrease to $522,635.  Also, if the court should find that the price quoted by defendant was $5,600,000, plaintiff's damages would decrease to $372,385.

17

G.      **SEPTA Practices and Regulatory Requirements**

102.    Approximately eighty percent (80%) of the Project was funded using federal funds granted through the Federal Transportation Authority ("FTA").  (Tr. II at 59-60.)

103.    When a SEPTA project is partially funded by the FTA, SEPTA is required to follow FTA guidelines and procedures in awarding a contract.

104.    According to SEPTA's Procurement Manual and FTA's Best Practices Circular 420.1E, SEPTA is obligated to perform an analysis and investigation in single bid scenarios to determine whether a re-bid would produce a lower price.  (Tr. III at 7; Ex. D-30.)

105.    Single bid evaluations typically take a substantial period of time for SEPTA to perform.  First, SEPTA must obtain information from the bidder.  SEPTA staff members then prepare a staff summary to be circulated amongst the various departments.  The directors of each department must sign off on the summary.  The general manager then must approve the summary.  Once approved, the issue goes to preparatory meetings, then to a public committee meeting, and finally to the SEPTA Board for approval.  (Tr. III at 15-18.)

106.    In this case, plaintiff was reluctant to release information it believed was confidential.  (Tr. II at 58-60; Exs. D-27, D-29, D-30.)  At the conclusion of the evaluation process, the SEPTA staff recommended that the contract be awarded and placed the Project on the agenda for the next SEPTA Board meeting, May 25, 2006.  (Ex. D-33.)

107.    In addition to the single bid evaluation, SEPTA is required to perform a reconciliation effort if the low bidder, as in this case, exceeds the engineer's budget by ten percent (10%).  The reconciliation is performed to determine the reason(s) why the bid(s) for a project exceeded the engineer's budget.  (Tr. III at 6-9, 12-14, 21-23.)

18

108.     Reconciliation efforts are led primarily by the SEPTA engineering group to determine the reasons the bid price exceeds SEPTA's estimate and whether a re-bid would produce a better result for SEPTA.  The reconciliation process typically takes a substantial period of time to perform.  (Tr. III at 7-8.)

109.     SEPTA's decision to conduct a reconciliation regarding the Bid was undertaken independently pursuant to SEPTA's normal procedures.  (Tr. III at 16-19.)

110.     SEPTA's decision to conduct a single bid evaluation and a reconciliation was unrelated to defendant's conduct.  (Tr. III at 16-19.)

**H.     Industry Practice and Custom**

111.     The parties each presented an expert witness who testified at the trial as to the usual manner and practice of conducting business between general contractors and subcontractors in the construction industry and particularly related to bidding practices.  Plaintiff presented Rick Foster.  (Tr. II at 85-121.)  Defendant presented Rocco Vespe.  (Tr. III at 33-98.)

112.     A general contractor does not commit to use a particular subcontractor by informing that subcontractor that its bid is the low bid and/or  asking the subcontractor to confirm its price.  (Tr. II at 112.)

113.     When a general contractor informs a subcontractor that its bid is "low," it does not mean that the subcontractor was the successful bidder, nor does it constitute a commitment.  (Tr. III at 60.)

114.     Listing a subcontractor as a DBE on the bid form does not create a contract or commitment between the general contractor and the subcontractor.  (Tr. III at 75-6.)

19

115.    There is risk inherent in the competitive bid process in the construction industry. On bid day, the general contractor solicits bids from subcontractors the general contractor has relationships with and some it does not.  (Tr. III at 61-2.)

116.    If a general contractor has not worked with a particular subcontractor before, it is standard practice in the construction industry that a reasonably prudent contractor check that subcontractor's references, financial information and facility capacity.  (Tr. II at 112-13; Tr. III at 62-3.)

117.    Plaintiff did not check defendant's capacity, finances, or references prior to considering defendant's Proposal.  (Tr. II at 29.)

**I.      Contract Formation**

118.    Contrary to plaintiff's assertions, a contract was not formed between plaintiff and defendant with respect to the Project.  Plaintiff contends that a contract was created on one of two dates.  First, plaintiff urges that a contract was formed on March 2, 2006, Bid Day, when defendant submitted the Proposal.  (Pl.'s Concl. of Law ¶¶ D, J, K.)  Alternatively, plaintiff maintains that a contract was created on March 20, 2006, when plaintiff advised defendant that the Project "was likely to be awarded to [plaintiff] and that [defendant] should, at [plaintiff's] risk, begin its work to complete the undertakings that it had made to [plaintiff] on March 2, 2006. By so stating and acting, [plaintiff] completed the contract under which [defendant] agreed to perform the undertakings that it committed itself to perform on March 2, 2006."  (Pl.'s Concl. of Law ¶ L.)  Plaintiff argues that defendant breached the contract so formed when it informed plaintiff on March 27, 2006 that defendant would not perform as set forth in the Proposal.  (Pl.'s Concl. of Law ¶ M.)

20

119.    The Proposal submitted by defendant to plaintiff on March 2, 2006 was an offer.

120.    Defendant's submission of the Proposal on March 2, 2006 did not create a binding contract between plaintiff and defendant, even though plaintiff used defendant's Proposal, with the price term altered, in formulating its bid to SEPTA.

121.    Although plaintiff notified defendant on Bid Day that it was the lowest bidder, a contract was not thereby formed between the parties.

122.    On March 20, 2006, plaintiff called defendant to request the break-out price for the shop drawings for the Project and told defendant that "it looked like the job was going forward." (Tr. I at 23, 104-05, 237-39; Exs. P-2, P-20, P-25.)  The next day, on March 21, 2006, in response to plaintiff's inquiry, SEPTA told plaintiff that no decision had been made on the Project. (Tr. II at 70-71; Exs. D-16, D-17.)  Plaintiff's communications with defendant on March 20, 2006, did not create a binding contract.

123.    Despite plaintiff's contention that a contract was created because it told defendant that "the Project was likely to be awarded to [plaintiff]" and requested a break-out price for shop drawings, a contract was not formed.  (Pl.'s Concl. of Law ¶ L.)  These statements do not serve as an acceptance of defendant's offer represented by the Proposal.  In the Proposal, defendant offered to perform an entire portion of the Project, not merely the shop drawings.  Plaintiff's communications represented a counter-offer for defendant to perform only the shop drawings and, the balance of the work contemplated in the Proposal should the Project ultimately be awarded to plaintiff.  Plaintiff's actions on March 20, 2006 did not "accept" defendant's Proposal, but, rather, were a counter-offer which defendant never accepted.  Hence, no contract

was formed on March 20, 2006.  Moreover, as noted below in the court's Conclusions of Law, plaintiff's counter-offer had the effect of rejecting defendant's original offer in the Proposal.

124.    Despite plaintiff's contention that defendant breached the terms of the Proposal because defendant committed to the EDIS Project before the thirty day term of the Proposal expired, the court finds that defendant did not breach the terms of the Proposal.  Plaintiff contends that the term of the Proposal stating that it would be void if not accepted within thirty days, meant that the Proposal would remain outstanding until April 3, 2006.  (Pl.'s Letter Br. at 1, 6.)  By accepting the EDIS Project on March 24, 2006, plaintiff urges that defendant breached the terms of the Proposal because the Proposal did not remain open for the full thirty days, until April 3, 2006.  However, prior to defendant accepting the EDIS Project on March 24, 2006, plaintiff had submitted a counter-offer to defendant on March 20, 2006 (in which plaintiff proposed that defendant calculate a break-out price for the shop drawings and perform that portion of the entire project separately).  Plaintiff's counter-offer served to reject the Proposal.  Hence, as discussed in greater detail in this court's Conclusions of Law, when defendant accepted the EDIS Project on March 24, 2006, its original Proposal from Bid Day had been rejected by plaintiff's March 20, 2006 counter-offer and no longer was able to be accepted.

125.    On March 27, 2006, defendant made a new offer proposing a revised production schedule.  (Tr. I at 102-05, 127, 137.)

126.    Plaintiff rejected defendant's new offer on March 28, 2006, when plaintiff sent a letter to defendant stating that it relied upon the original Proposal in making the Bid.  (Tr. II at 152-55, 163-67; Ex. P-30.)

127.    Plaintiff made a counter-offer on March 30, 2006, when it sent defendant the Letter of Intent proposing terms different from defendant's original Proposal.  (Ex. D-19.)

128.    By letter dated April 4, 2006, defendant rejected plaintiff's counter-offer as set forth in the Letter of Intent and raised objections to the terms of the Letter of Intent.  (Tr. I at 198; Ex. P-4.)  At that time, plaintiff had not yet been awarded the Project by SEPTA.  (Tr. II at 221; Ex. D-23.)

129.    None of the offers/counter-offers were accepted by either party.

130.    When plaintiff told SEPTA on March 27, 2006 that plaintiff was at risk of losing its precast concrete subcontractor, plaintiff knew that defendant was not subject to a binding contract.

131.    The instant situation was risky for plaintiff at the outset, especially since plaintiff knew that the precast concrete portion of the Bid was "key."  (Tr. III at 70.)  Plaintiff knew that defendant's Proposal expired by its own terms in thirty days, yet SEPTA required general contractors such as plaintiff to hold their bids open for ninety days.  (Tr. III at 68.)

132.    The plain language of the Proposal clearly stated that it was conditioned upon defendant being able to perform the fabrication work in the June through August, 2006 time frame.  (Tr. III at 69.)  Plaintiff knew that defendant's ability to perform the work was conditioned upon the Precast Elements being fabricated in June through August 2006.  (Findings of Fact Nos. 52-55.)  The work was not performed during this time frame.

133.    No contract was formed between the parties.

II.   **CONCLUSIONS OF LAW**

_____   The parties agree this court has jurisdiction over this case.  28 U.S.C. § 1332.

A.   **Pennsylvania Common Law Not the Uniform Commercial Code Applies**

Contrary to plaintiff's argument, the Pennsylvania Uniform Commercial Code (the "U.C.C.") does not apply to this construction transaction.  For over eighty years, Pennsylvania courts have refused to characterize construction contracts as sales contracts.  In York Heating and Ventilating Co. v. Flannery, 87 Pa. Super. 19, 23-24 (1925), a case involving the application of the Uniform Sales Act, on which the U.C.C. was based, to a contract for the installation of a heating system, the Superior Court of Pennsylvania held:

> The contract in suit was in no sense a contract of sale.  It was a construction contract. . ..  This plaintiff took specified materials and apparatus, manufactured and supplied by various dealers and by assembling them . . . constructed a new and different unit, a completed heating system.  The operation was one of building, or construction, not of sale . . ..

Id. at 23-4.  Courts have adopted the same approach when construing the U.C.C.  In DeMatteo v. White, 336 A.2d 355, 357-58 (Pa. Super. Ct. 1975), homeowners sued a building contractor when the brick used in construction of their houses was found to be defective.  The Superior Court of Pennsylvania concluded that the U.C.C. did not apply and stated as follows:

> It was [the contractor's] duty under the contract to provide the highest quality materials and to use those materials in the construction of the house.  However, there was no agreement between [the parties] which provided for the sale of "raw materials" (bricks, roofing tiles, plaster, etc.) as such.  The contract provided for the construction of a building, not for the sale of goods as recognized by the U.C.C.

Id. at 358.  See also Matthews v. Metro. Contract Carpets, 1988 WL 124900, at *2-3 (E.D. Pa. Nov. 23, 1988) (same) (citing Manor Junior College v. Kaller's Inc., 507 A.2d 1245 (Pa. Super.

24

Ct. 1986) (contract to install new roof not a sale of goods under the U.C.C.)); <u>Able Steel Erection Co., Inc. v. Franks Collision Service, Inc.</u>, 72 D&C 2d 177 (C.P. Phila. 1975) (contract to install motorized steel door not a sale of goods).  By comparison, in <u>Belmont Ind., Inc. v. Bechtel Corp.</u>, 425 F. Supp. 524 (E.D. Pa. 1976), the defendant contracted with the plaintiff, on a purchase order basis, to design, fabricate and deliver steel to be used in the construction of a petrochemical complex.  <u>Id.</u> at 525.  Other subcontractors were to erect the structure, supply the crane assembly, supply the control systems, sandblast and paint the structure, as well as provide additional work and materials.  <u>Id.</u>  The court concluded that the contract at issue was not a construction contract. <u>Id.</u> at 527.  The plaintiff was merely to furnish the steel, and had no "contractual responsibility . . . related to the building of the container handling facility."  <u>Id.</u>  The court contrasted the situation in <u>DeMatteo</u> where the obligation to furnish the materials was incidental to the main purpose of the contract namely, the assembling of the materials into a new, different and completed unit.  <u>Id.</u>

       Here, any contract between plaintiff and defendant would be a construction contract governed by Pennsylvania common law, not a sale of goods.  Plaintiff admitted that if it were solely purchasing goods, it would have used a purchase order and not a subcontract agreement.  The provision of the Precast Elements was secondary to the main purpose of the relationship, the construction of a new, different and completed unit.  Hence, the U.C.C. does not apply to the instant transaction.

     **B.**    **Pennsylvania Common Law of Contracts**

       The court will apply Pennsylvania common law to determine whether plaintiff and defendant entered into a binding, legal contract.  Under Pennsylvania common law, formation of a contract requires an offer, consideration, and acceptance.  <u>Bilt-Rite Contractors, Inc. v. Patriot</u>

Roofing, Inc., 1999 WL 124465, at *4 (E.D. Pa. Mar. 4, 1999). The court further explained the

law in Pennsylvania as follows:

> "It is black letter law that in order to form an enforceable contract, there must be
> an offer, acceptance, consideration or a mutual meeting of the minds." Jenkins v.
> County of Schuylkill, 658 A.2d 380, 383 (Pa. Super. 1995) (citing Schreiber v.
> Olan Mills, 627 A.2d 806, 808 (Pa. Super. 1993). An acceptance must be
> identical with the terms of the offer. Hedden v. Lupinsky, 176 A.2d 406, 408 (Pa.
> 1962). A reply to an offer which adds qualifications or requires performance of
> conditions, although purporting to accept the offer, is not an acceptance but a
> counteroffer. Id. To result in a contract, an acceptance must be unconditional and
> absolute, id., and so long as any condition is not agreed to by both parties the
> dealings are mere negotiations and may be terminated at any time by either party.
> Alexanian v. Fidelity-Philadelphia Trust Co., 30 A.2d 651, 652 (Pa. Super. 1943).

Id.

Plaintiff bears the burden of proving each element by a preponderance of the

evidence. Bilt-Rite Contractors, 1999 WL 124465, at *4; Viso v. Werner, 369 A.2d 1185, 1187

(Pa. 1977).

A subcontractor's bid is an offer which the general contractor must accept to

create a contract. Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 250

(3d Cir. 2007) (applying New Jersey law). The submission of a bid by a subcontractor to a

general contractor does not create a binding contract even if the bid is used by the general

contractor in making its bid on the project. In Fletcher-Harlee, the Third Circuit Court of

Appeals explained the perilous world of general contractors, subcontractors and the bidding

process.

> This is a cautionary tale of offer, acceptance, commercial practice, and
> how to amend a complaint. In the construction industry, general contractors
> compete for work by submitting bids detailing how they will complete the project,
> the materials they will use, the time it will take, and the price they will charge. To
> prepare these bids, general contractors in turn solicit bids from more specialized

26

subcontractors. It is well understood in the industry that bids at both levels are "firm offers;" in other words, subcontractors submit bids expecting to be held to their terms if selected.  General contractors really on subcontractors' bids to create a single-priced package of work.  A subcontractor's subsequent refusal to honor its bid wreaks havoc on the general contractor's bid – and can quickly turn a profitable project into a financial "black hole."

. . .

As this case demonstrates, however, there is a contract-law principle more powerful than commercial practice: we interpret documents in accord with their plain language. [Restatement (Second) of Contracts] at § 203(b) ("Express terms are given greater weight than . . . usage of trade.).  When the text of a subcontractor's bid, which would typically be a firm offer, specifically states that it is not one, we must follow the text.  Therefore, we cannot allow a general contractor who purports to accept such a bid to sue for breach of contract or for promissory estoppel.

Id. at 249 (footnote omitted).  See Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc., 892 A.2d 830 (Pa. Super. Ct. 2006) (applying Pennsylvania law and Restatement (Second) of Contracts § 203).  See also Williams v. Favret, 161 F.2d 822, 824 (5th Cir. 1947) (bids to contractors were offers; no contract formed until offers accepted); Lindsey Masonry Co. v. Danis Envtl. Inds., Inc., 2003 WL 1697725, at *5 (D. Kan. Mar. 26, 2003) (applying Kansas law, general contractor's use of subcontractor's bid in winning bid, is not acceptance of subcontractor's offer); Arok Constr. Co. v. Indian Constr. Servs., 848 P.2d 870, 873 (Az. App. 1993) (applying Arizona law, general contractor does not create contract by relying on subcontractor's bid or listing it in its bid).

In Fletcher-Harlee, the Third Circuit Court of Appeals emphasized that documents, including bids from subcontractors, must be interpreted in accord with their plain language.  A general contractor must consider all terms and conditions of a subcontractor's proposal.  Plaintiff cannot ignore the terms and conditions contained in defendant's Proposal.

27

The fact that a general contractor informs a subcontractor that it was the lowest bidder does not create a binding contract between the parties.  See Leskie v. Haseltine, 25 A. 886, 886-87 (Pa. 1893) (no contract created where a subcontractor is told that it is the "lucky man" or lowest bidder).  See also Elec. Constr. and Maintain. Co., Inc. v. Maeda Pacific Corp., 764 F.2d 619, 621 (9th Cir 1985) (mere use of subcontractor's bid by general contractor bidding on prime contract does not constitute acceptance of the subcontractor's bid); Electro-Lab of Aiken, Inc. v. Sharp Constr. Co. of Sumpter, Inc., 593 S.E. 2d 170 (S.C. App. 2004) (general contractor's use of subcontractor's bid and telling subcontractor its bid was "low," does not create acceptance of subcontractor's offer).

"A reply to an offer, though purporting to accept it, which adds qualifications or requires performance of conditions, is not an acceptance but a counter-offer." Hedden v. Lupinsky, 176 A.2d 406, 408 (Pa. 1962) (citing 1 Restatement, Contracts, § 60 (1932)).  "To constitute a contract, the acceptance of the offer must be absolute and identical to the terms of the offer." Id. (citing Cohn v. Penn Beverage Co., et al., 169 A. 768 (1934)).

"It is established law that a counter-offer operates as a rejection, terminating the original offer." Webb v. City of Philadelphia, 2000 WL 502711, at *2 n.4 (E.D. Pa. Apr. 27, 2000) (citation omitted).  See also Bair v. Purcell, 2007 WL 2219306, at *6 (M.D. Pa. Aug. 2, 2007) (counter-offer has effect of terminating original offer); Mazzella v. Koken, 739 A.2d 531, 536 (Pa. 1999) (same); Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc., 764 A.2d 587, 593 (Pa. Super. Ct. 2000) (same).

28

Here, no contract was formed between the parties.  The parties exchanged a series of offers and counter-offers.  Each counter-offer served to reject any outstanding offer.  Plaintiff's claim for breach of contract must fail.

Plaintiff also argues that "[defendant], by its unprecedented, surreptitious actions, precluded [plaintiff] from accepting the offer the [defendant] had extended before the offer, by its terms, was no longer capable of being accepted."  (Pl.'s Letter Br. at 1.)  Plaintiff contends that the term of the Proposal stating that it would be void if not accepted within thirty days, meant that the Proposal would remain outstanding until April 3, 2006.  (Pl.'s Letter Br. at 6.)  By accepting the EDIS Project on March 24, 2006, plaintiff urges that defendant breached the terms of the Proposal because the Proposal did not remain open for the full thirty days, until April 3, 2006.  However, prior to defendant accepting the EDIS Project on March 24, 2006, plaintiff had submitted a counter-offer to defendant on March 20, 2006 (in which plaintiff proposed that defendant calculate a break-out price for the shop drawings and perform that portion of the entire project separately).  Plaintiff's counter-offer served to reject the Proposal.  Hence, when defendant accepted the EDIS Project on March 24, 2006, its original Proposal from Bid Day had been rejected by plaintiff's March 20, 2006 counter-offer and no longer was able to be accepted.  Plaintiff's claim that defendant breached the terms of the Proposal must fail.

C.      **The Doctrine of Promissory Does Not Apply**

The law in Pennsylvania is clear that the doctrine of promissory estoppel does not apply where "the question of defendant's liability can be decided properly and finally on contractual principles of offer and acceptance." Hedden v. Lupinsky, 176 A.2d 406, 408 (Pa. 1962).  See also Lobar, Inc. v. Lycoming Masonry, Inc., 876 A.2d 997, 1000 (Pa. Super. Ct.

2005) (citing <u>Hedden</u>).  The instant case can be decided properly and finally on contractual

principles of offer and acceptance.  The doctrine of promissory estoppel does not apply.

       Even if this court were to apply the principles of promissory estoppel here,

plaintiff  would not prevail.  Under the doctrine of promissory estoppel, "a promise that induces

reasonable reliance on the part of the promisee may be binding 'if injustice can be avoided only

by enforcement of the promise.'"  <u>Green v. Interstate United Mgmt. Servs. Corp.</u>, 748 F.2d 827,

830 (3d Cir. 1984) (quoting Restatement (Second) of Contracts, § 90(1) (1981)).  Here,

plaintiff's alleged reliance on defendant's original offer was not reasonable given the contingent

nature of the offer.  Plaintiff proceeded with the SEPTA Project while ignoring the preconditions

explicitly set forth in defendant's Proposal.  For example, plaintiff ignored the fact that the offer

was contingent upon the precast concrete being fabricated in June through August of 2006.

Moreover, plaintiff proceeded with the SEPTA Project even after plaintiff knew defendant was

unable to serve as the precast concrete subcontractor and would need to be replaced at a higher

cost.  Therefore, plaintiff cannot recover on its promissory estoppel claim.  <u>See</u> <u>Green</u>, 748 F.2d

at 831 (refusing to apply promissory estoppel because the "manifestly contingent nature" of

promise made reliance thereon unreasonable).

       For all the above reasons, judgment will be entered in favor of defendant and

against plaintiff in this matter.

BY THE COURT:


/s/  Thomas J. Rueter
THOMAS J. RUETER
United States Magistrate Judge